Good afternoon. My name is Anthony Pallack. I'm here on behalf of the defendant and appellant, Mr. Cesar Caballero, and may it please the court. We would like to address this case as follows. We think that the attempt by the plaintiff appellees to use the Lanham Act as a way to determine who has the rights to a mark used in court in commerce is actually a way of legal, it's kind of using a legal shoehorn to sort of stuff the question of determining the identity of the parties and their rights into the Lanham Act when really it should be decided under Title 25 of the United States Code, which deals with the determination of who members of a tribe are, and this is done by the Bureau of Indian Affairs. Well what would happen, let's say I were to decide that I was actually the mayor of Portland and the mayor was not properly elected. I could certainly say that as much as I wanted to. I'm repeating myself apparently. What would happen though if I started using the City of Portland logo and a City of Portland checking account and went around telling people to fix their sidewalks because I was the mayor and I was acting for the City of Portland. Why isn't my use of those logos and so forth a trademark problem as well as potentially other kinds of problems as well? Well actually I think there are three ways to address that. The first is, is a Lanham Act proper for a city to use? Now I know that there is a case that was cited by the other side that talks about the DMV using it. We want to point out of course that the Native Americans are a sovereign entity. Their relationship is basically governed by Congress and statutes. I'm a governmental entity and that's why I used that as an example because clearly if I pretended to be Coca-Cola or something that would be a lot easier. Is there a reason why a governmental entity can't have a trademark? Well it's possible if it's a particular business but I think if it's the identity of the city itself that's going to be dealt with by state laws that determine city incorporation and not the Lanham Act. Let's say the city is allowed to operate a casino for the sake of argument. Yes, then the city can say well we have a trademark in the name of our casino, Red Hawk Casino let's say. But trademark doesn't always require a profit making business does it? No it doesn't. I mean you could be a non-profit and have a trademark. This is true like in the Yoast case for example that the court was asking about. This is true. But what we're saying is that the United States District Courts have never been the place to decide who natives are and this issue has been skirted and glossed. And so now we are in this position of having to defend on a trademark. Why does it even matter? Suppose the main tribe isn't really the tribe but nonetheless they've been using this mark. And you know he can use another mark even if he's later determined to be the true tribe. I guess I don't see why the existence of a mark is dependent in any way on the legitimacy ultimately to be determined of the entity. This is exactly what I'm saying. If we were talking about Red Hawk Casino this would clearly be a trademark issue. I think we're talking past each other because I guess I'm saying that even if he turns out to be correct, he still may be infringing the trademark of this entity whatever it turns out to be. Well if he's correct then the other party cannot claim ownership of the trademark because they aren't Native Americans. This is the problem. In order to say that they're owning a trademark. Judge, can I ask a question? Hi Judge. If you're going to pin your hole, I'd like to turn, let's assume we weren't dealing with tribes. Let's assume all the facts are exactly the same but we weren't dealing with tribes. Because if your entire argument turns on the fact that it's an Indian tribe, I think you've got some problems. Supposing for example that someone else calling itself the Republican Party or the GOP with an elephant as its symbol went out and advocated positions that were diametrically opposed to the Republican Party. Is that a Lanham Act violation or not? Well that could be a Lanham Act violation. I'm sorry. Even though there's no profit involved. Right. No, I think we would concede that could be a Lanham Act case. But I think that there is a problem. I think the court asked the question in the questions that were submitted to us just a couple weeks ago about the difference between use and commerce and for creating a mark and the confusion that might result in how that mark is used. And of course those things go directly to the Lanham Act. And what we're saying is that they, at the very least, at the very least, there's a genuine issue of disputed material fact as to who the owners are of this trademark at the very least. But we're also saying that when you litigate that question, there's also going to be the question of who are the people who say they own it. In other words, can they literally, can they own the mark under law? And we say no. So there is at least a genuine issue of material fact which was never addressed by the court. I don't actually even, I guess I don't follow that argument. And maybe I'm just thick-headed today or maybe I'm thick-headed more than just today. But let's say there's a dispute about who owns a corporation. The corporation may have a mark that it's used in commerce or used to provide services. And that's going to be true regardless of whether the upstarts eventually get to be owners. But it seems like the second people can't just begin to use it without having a Lanham Act problem. Well, the problem is that my client and the people associated with my client who are here today, they've been using the mark for decades, they and their parents and their grandparents. And just because another group who are actually the Verona Band of Indians and not the Miwok Indians can create a profitable enterprise in the guise of a casino doesn't mean that all of a sudden the other Indians can't be Miwok Indians. Well, the casino part in some ways seems easier for you to argue than the tribal marks, I guess just in my own mind, because your client was offering services under that mark when it belonged to somebody else. I mean, that part seemed... We're actually disputing that fact. We're disputing that. We say that he actually owned the mark or him and those who are associated with him decades earlier, decades. But the tribe registered the mark, right? There are a number of marks involved, but the Red Hawk Casino mark, mark or marks, have been registered with the PTO. And doesn't that give them a presumption of ownership, a presumption of protectability that you have to overcome? Well, that's a very interesting point because actually my understanding of the lawsuit is that Mr. Caballero and, by implication, others are being sued or Mr. Caballero is being sued because he's used the name Miwok Indian. And, in fact, the use of the Red Hawk Casino mark is not really at the core of this case. They're saying that he calls himself a Miwok Indian. He claims to be the chief of the Miwok Indian tribe, that they provide certain governmental services to their constituents, and that this is creating confusion for the other group, which we say are not really Miwoks. They are the Verona Band of Indians. But, in any event, this is an issue of dispute as to who is really in ownership of the mark. And we say the tribal name is the issue, not the casino. Because whoever has the use and control of the tribal name and can identify themselves as the Miwok Indians, they pretty much, by default, own Red Hawk. That doesn't make any sense to me. Go ahead. I mean, why is that so obvious to you? That makes no sense to me. I'm sorry, in which regard? Like whoever wins the dispute over the use of the tribal marks automatically wins, has the right to use the Red Hawk Casino marks. Why would that be true? Because only an Indian tribe can operate a casino in California. Okay. And they created the casino purportedly as Miwoks. Well, but the name actually doesn't even have anything to do with the tribe, right? The name Red Hawk or the name Miwoks? The Miwok Indian tribe name is not associated directly with the marks related to the casino at all, right? I think it is. The Miwok Indians claim to own, or the people who claim to be Miwok Indians claim to own the Red Hawk Casino. But in the context of the use of the marks, there's the Red Hawk Casino mark. Okay. It doesn't use the word Miwok or anything. It's Red Hawk Casino. Then there's a separate mark, the Shingle Springs Band of Miwok Indians, and I think there's a related mark, Shingle Springs Rancheria. But whether somebody operates or owns or can operate or can own a casino, I guess I'm having the same difficulty as Judge Watford seeing why winning on one affects the other. Well, it's not really the ultimate problem to be decided by the court today, so I didn't want to go off on a tangent. But we would say that whoever can call themselves Miwok Indians, they are going to have a great number of rights and benefits and privileges that come with being recognized as such by the Bureau of Indian Affairs. And none of which involves per se getting a trademark on anything. That's correct, and that's exactly why we think that the district court has erred, because they're trying to decide an issue by implication that really needs to be decided by the federal government, and we happen to know in this case the Bureau of Indian Affairs has skirted their obligation in this case to decide the question and has said instead, go file a trademark action. And this is not what Congress intended. Congress did not intend for the district courts of the United States to be deciding who are the members of tribes by the filing of Lanham Acts. And I would refer the court to one case citation that wasn't put in the brief. I didn't write the brief myself, but it's the Santa Clara Pueblo versus Martinez case. I don't know if you know about this. At least one judge, but I'll give you the citation. It's 436 U.S. 49. It's a 1978 case, and it says membership issues are not to be decided in the federal court. And we think that what's happened here is one group of Miwoks, who were originally the Verona Band, is, as I said earlier, using the Lanham Act as a kind of legal shoehorn to fit their membership case into the federal court because they know that if it's litigated properly under Title 25 and they go to the Bureau of Indian Affairs and have that issue decided by them, they're going to lose. I guess I'm still baffled by that. What if, you know, five random people that we pull off the street decide that they wish to register a trademark that says the five Native Americans tribe, and none of them is Native American? I'm not sure why that affects their ability to have a mark that's registered or that they can use. It may involve fraud if they go out and market themselves as a minority business or something, but that's a different problem. What is it about gaining a trademark that per se says, aha, you're the real tribe? That's exactly what we're saying. No, but it has the opposite implication because having a trademark says nothing one way or the other about your validity as a tribe, and therefore deciding about the trademark says nothing about whether you are valid or not valid, and therefore has nothing to do with a Title 25 requirement to decide who's a member of what. I think this goes back to your questions, Your Honors, what's it called? A hypothetical set of facts with regard to the city, okay? The fact that some people claim to be the city could be a trademark infringement, or in this case, the five people who claim to be Indians. But the problem is if the district court is not taking proper evidence of who those people really are, in fact, it could be the mayor, or it could be somebody who is removed from power, or it could be five legitimate Indians who actually are the tribe. But the problem is by usurping essentially the tribe's name, which really is just a descriptive mark, it's even questionable as to whether or not it's protectable under that designation. That's not a theory you raised on appeal, is it? Well, it wasn't briefed, but I can say that it's a problem. I mean, it's a problem that's going to arise. If it wasn't raised as to whether it's a protectable mark, that's not before us. Except subject matter jurisdiction always is. And what we'd be arguing is that the court doesn't have subject matter jurisdiction to decide who Indians are. No. That's a different question. Was it raised in the district court? It wasn't raised in the district court, and it wasn't raised in this court, but you're raising it now at oral argument? Well, subject matter jurisdiction can always be raised, and this court always has the jurisdiction to decide those questions. So you're saying that a defect in a mark, whether it's protectable or not, is a jurisdictional question and not a substantive question about winning or losing a trademark claim? We are arguing that it isn't under the present circumstances because the court no longer has jurisdiction. If the question is understood as it truly should be, which is who are these people and do they have a right to do what they're doing, we would argue the court is without subject matter jurisdiction to decide that issue. Your time has expired, but we've asked a lot of questions, so you may have two minutes when the time comes for rebuttal. I appreciate that. I would reserve the time for rebuttal unless there's a pressing question. You've used all of your time, but we'll restore some for you after the other side has had a chance. Thank you, Your Honors. Thank you. Okay. We'll hear from Mr. Barker. May it please the Court, Ian Barker for the Shingle Springs Band of Miwok Indians. I have a couple of issues that the other side has raised that I'd like to address. Then I was planning to focus on the issues relating to competing commercial use raised in the court's August 11th order, though I'm also prepared to discuss any aspect of the case in which the court has interest. Well, why don't you just start with the point that counsel tried mightily to emphasize during his argument. Why doesn't this boil down to a dispute that really is better resolved by maybe a federal agency rather than a federal district court? The issue of who is the federally recognized tribe is not before this court and has nothing to do with the issue. Well, we know who the federally recognized tribe is currently, but the contention is that you're not really the Miwok Indian tribe that's entitled to use that name, and really some other expert agency, not us certainly, should be the ones to decide that. And once that matter is resolved, then we'll know who is entitled to use the name as a mark, right? Well, for purposes of this appeal, Mr. Caballero did actually raise an attack on the tribe's sovereign status before the district court in the form of a counterclaim. That counterclaim was dismissed because the court did not have jurisdiction to address that, and that decision was not appealed and it wasn't included in this appeal. It wasn't raised in the opening brief. Moreover, the uncontradicted evidence in the record demonstrates that this tribe is the federally recognized tribe. It's the one that's listed. The List Act indicates that the tribe that's listed is the one that's recognized. And I think all that matters, that the tribe, I think there's extra weight given to the tribe's use of its name because it is listed and Congress has put its imprimatur on the tribe's use of that term. But as Judge Graber mentioned, it's the tribe's use of that term, the priority of that use in commerce, to which rights under the Lanham Act attach. And the tribe had been using that name for decades before Mr. Caballero showed up and declared himself the chief of the tribe. It was only after the tribe announced its plans to open a casino that Mr. Caballero all of a sudden had an interest in being the federally recognized tribe. So let's focus on the uses in commerce then. You've got, as I understand it, two theories. One is sort of the tribes use it in government-to-government relations, and then a secondary use or set of uses is the, I don't know, educational informational services? Sure. Yes, that's correct, Your Honor. Why is that first? I'm not even sure that that first category, the government-to-government relations, is even, why is that within the Lanham Act? I guess I'm stuck there. I guess I have a better understanding of the second category, but maybe start with the first. Sure, Your Honor. I would start with, I think we have to go back to the controlling case of Committee for Idaho's High Desert versus YOST, which I'll refer to as CIHD or KID for short, and that involved the dispute between two nonprofit advocacy groups. The relevant consumer group for the advocacy group's competing services included kids' members, potential members, public officials, and agencies involved in the policymaking decisions, and other members of the interested public. And the acts for which the defendants were liable there were just two acts. One was formation of a corporation under the plaintiff's name, and two, appearing at a government hearing under the plaintiff's name. And so those two acts constituted use in commerce under the Lanham Act. And so if a private entity can have its own advocacy services to governments protected, there's no reason that another government should have less protection than what an ordinary private group has when they're reaching out to the government. The tribe provides services in its relationships to these governments. What are the services that you provide to the government? One of the services, Your Honor, is they're set forth in the supplemental brief, which I understand Your Honors have not ruled about whether that will be accepted. So I will set them forth here out of abundance of caution. So for instance, in the record is a memorandum of understanding with Eldorado County, which involves millions of dollars in payments from the tribe to the county and millions of dollars of payments from the county to the tribe regarding off-reservation traffic and health services for the public at large. So there's the tribe directly providing services to a government, both in the form of actually providing the health clinic services to another government's citizens and also providing the service of allowing the government to fulfill the duties that it has to federally recognized tribes within its jurisdiction. And another example would be the instance of the University of California repatriation of remains. In that instance, the University of California was working with the Shingle Springs Band of Miwok Indians because it has duties under federal law and other types of law to send the remains to a federally recognized tribe that meets certain characteristics in relation to descendancy from these remains. So the tribe provides a service to the university by providing information about it being a federally recognized tribe, about its history, about its relationship to these remains. And that allows the university to fulfill its duties under federal law to send these remains to the correct recipients, in this case, the tribe. Also, in the instance of the Postal Service, the tribe, it may seem like the tribe has a, that the tribe is, in a sense, the recipient of postal services there because it receives the mail, and that's a service. But it's also providing a service to the Postal Service of receiving mail that postal service customers have put into the stream of commerce. But there's no evidence that any of these government officials that you've just mentioned were actually confused at the end of the day, is there? I mean, certainly the university folks, I mean, they quickly figured out that the defendant was claiming to be, you know, an entity other than, I mean, that was the whole point, right, of his contact. Don't send it to the wrong entities. Send the remains to me because I'm the true representative of the tribe, and same with the Postal Service, as I understand. They pretty quickly figured out, oh, this guy is claiming to be, you know, represent some other group, not the group that you're representing here, right? Respectfully, Your Honor, in the case of the University of California service, there was initial, definitely initial confusion, and it was only after, and the declaration reflects that only after they, quote, did some research, did they figure out that this was the wrong guy. But initially, they were confused. So there's a potential for an initial interest confusion type confusion that applies there. And it shows that there's a risk of confusion. If someone can be confused into dealing with him and, you know, initially believing that's him, that shows a risk of confusion in the future, in addition to all the other, you know, confusion that Mr. Kaviar generated. He did divert the mail for a time. That's right, and thank you, Your Honor. That was the second point I was going to get to, is that Mr. Kaviar's own declaration regarding the mail indicates that he deceived the postal clerk by showing, he showed the postal clerk all of these documents that had been issued in his name, the fictitious business name statement, the business license, the IRS employer ID. He showed these to the postal clerk, and Mr. Kaviar's own declaration establishes that it was, and this is in the supplemental brief, establishes that it was, that these communications convinced the postal clerk to put the mail on hold. So mail actually did get diverted from the tribe.  The tribe's mail was stopped for a period of time. And so I think these are just a couple instances that show if somebody whose job it is to deal with governments or deal with, you know, particular entities can be confused, then that just shows the potential for the sister governments, the public, the entities with which the tribe has external relationships to be confused. All right, but before you get to the confusion point, don't you also have to show that the alleged infringer used the mark in connection with goods or services? What goods or services was Kaviaro providing, and to whom was he providing goods and services? Thank you for that question, Your Honor. Mr. Kaviaro, in the postal example, was providing a competing service of providing information about his group, competing with the tribe's service of providing, that I was alluding to earlier, that the tribe provides a service to the postal service by allowing its customer's mail to be delivered to where it's intended. Mr. Kaviaro. That's a pretty attenuated argument, and both, are those services, and is that what we really mean by services, that you're allowing the postal service, so every one of us, every citizen of the United States is providing a service to the U.S. Postal Service, and if somebody else has the name Paul Friedman, then he's interfering with my mark by providing, by allowing the postal service to deliver mail. I mean, that's pretty attenuated in terms of what we mean by the term services, isn't it? I think that the term services has quite a broad meaning under the Lanham Act, but I think it. There's also, if I may, just correct me if I'm wrong about this, though, because it seemed important to me. I understood that on Mr. Kaviaro's website, he offers services as a historian, and that he offers services on tribal enrollment, and those would be presumably more characteristically services. Is that a correct recollection of the record? That's correct, Your Honor. Thank you. And I was intending to get there, to emphasize that Mr. Kaviaro put up a website using the tribe's marks, under which he not only solicited services from members of the public, but he testified in his deposition, and those citations are in the supplemental brief. I can pull them up now if that would be helpful, but he testified that, indeed, people contacted him who were attempting to gain admission, enrollment, in the federally recognized Shingle Springs Band of Miwok Indians. So that is classic association services on the order as this court, in the controlling precedent of the Kidd case, established that those sort of services are protected under the Lanham Act. Isn't the Kidd case superseded by Bosley? I mean, Bosley is 10 years later, and Bosley said the Lanham Act is limited to cases where the alleged infringer is trying to profit from the plaintiff's trademark. So Kidd talked about something that Bosley seems to reject. Not at all, Your Honor. Respectfully, the history, if we trace the history of the Kidd case, the Kidd case was followed in United We Stand America, and in United We Stand America applied the Lanham Act to nonprofit activities by a political party, and then Bosley, in holding that what matters is competing services, Bosley cited United We Stand America to hold that it's the fact that services are competing that matters. The sentence in which profit is mentioned that Your Honor is referring to, the exact phrase is profit from a plaintiff's trademark, and that's sandwiched in the middle of a paragraph that distinguishes the use of a mark to identify, quote, an object of criticism on one hand from, on the other hand, using trademark law to function to, quote, designate the product of a particular trader and to protect his goodwill against the sale of another's product as his. So profit in that sense is referring to the use of the mark as a false service identifier, a false source identifier. As distinct from he can say as much as he wants, they are frauds. I'm the real deal. That's fine. It's just the use of the mark with the offer of these various services that you're worried about. Yeah, that's correct, Your Honor, and that's a good segue into the Radiance Foundation case that Your Honors, that the court asked about in the supplemental in the order of August 11th. And in that case, the Radiance case is consistent with the Ninth Circuit distinction between, on one hand, permissible use of the mark to identify an object of criticism, and on the other hand, impermissible use of the mark as a source identifier. In that case, the Fourth Circuit concluded that a single piece of website content, which appeared among a large amount of material having nothing to do with the NAACP, didn't create a likelihood of confusion as to NAACP's authorship or affiliation. So with that background, because there wasn't any deceptive source identification, the author of that piece was able to convince some of the readers that the NAACP, the name contained the word abortion, or that the NAACP supports abortion. But that wasn't actionable because it was the author saying these things, not the author purporting to say these things on behalf of the NAACP. So here, where you've got Mr. Caballero purporting to speak as the tribe and interfering with the tribe's relationships with all the folks with which it does business, including governments, private companies, members of the public. And make no mistake, Mr. Caballero absolutely has a profit motive here. In his counterclaim, he sought to appropriate to himself, he asked for a judgment that provided to him all of the tribe's profits from its relationships with the various governments that it relates to. He also indicated in his deposition that he filed the fictitious business name statement because he and his group, quote, wanted to participate in economic development projects. Counsel, you have exceeded your time, and I think we understand your position. If my colleagues have further questions. I just have one additional question. We have not talked about the cyber squatting claim yet. And your last comment suggested a question to me, which is, is there any evidence in the record that he intended to profit from his activities in bad faith, which is one of the requisites for cyber squatting, or to put it another way, are there undisputed facts in the record that entitle you to summary judgment on the cyber squatting claim, or is that at least a genuine issue of material fact? I don't think there's an issue that Mr. Caballero intended to profit through his scheme. I would point to the counterclaim where he's seeking all gains and profits of the, quote, casino Indians, his desire to pursue economic development. And I would also point to the case of DSPT versus Nahum, which was in our answering brief. And that indicates a broad definition of profit that can include leverage in a dispute. And Mr. Caballero testified that he was willing to exchange certain of the domains that he had registered to the tribe if it would cease using its Shingle Springs Band of Miwok Indians name. And that indicates that he certainly had a bad faith intent to profit in the, apart from his seeking monetary benefits from the tribe and trying to capitalize on what the tribe has done, he was seeking a gain or return in the broadest sense by using these domains as leverage in his dispute with the tribe. Do you have further questions, Judge Weidner? No.  No. Thank you. Thank you, Your Honors. Do you have some rebuttal time? Yes, Your Honor. Would it be the four minutes that he went over, or would there be six minutes? No. Use the two, and if we have additional questions, we'll answer them. All right. Thank you, Your Honors. Whatever Mr. Caballero did, he did for his tribe. There is no evidence of bad faith, and we take issue with the fact that the other side claims that they've got federal recognition. If Your Honors will go back and look at the record carefully, no such federal recognition is in evidence besides some very old documents that don't say anything about the present parties and whether they're entitled to act as they do. We cannot allow the judgment of the University of California and the judgment of the United States Postal Service to substitute for the Bureau of Indian Affairs decision. This should not be de facto recognition. This should be de jure recognition. We have the list going back to 1979. That's a very old list. Every year since then, right? Now, it's changed. The name changed a little bit at the outset, but since I can't remember what point in the 1980s going forward, this particular band of Indians has been recognized by the federal government as, right, the Shingle Springs Miwok, whatever that full name is, right? And Mr. Caballero is part of that band. We've got a letter in the file that says he's a Miwok Indian. He's taking issue with the fact that this particular group claims to be the tribal governance council or the real tribe, if you will, or the people who represent the tribe, when in fact there's thousands of people who are disenfranchised by this de facto recognition that's occurred because of a gaming license. The Bureau of Indian Affairs has not weighed in on this question. They have not determined if these people are actually authentic, and therefore there's a genuine issue of material fact. When you're talking about the repatriation of burial remains, you know, of one's ancestors, it shouldn't be the regents of the University of California that say, well, we think this group is because they have a casino, or we think this group is because they seem more legitimate. That's not how this is supposed to work. And so what happens is you've got many, many people who are doing the things that they've done, the services they only provide to their constituents, not to the public at large, such as goat herding, some medical services, and some historical services. And in fact, because of what's happened because of a gaming license, now you've got this group that claims to be representing the Miwoks, and they're not. And this is an issue that the federal district court really doesn't have jurisdiction to decide, and it underlies as a premise to everything else because it ends up being who owns the name Miwok Indian. So that's our... Thank you very much for your time. I think we understand everybody's position. And Judge Friedman, do you have any further questions of counsel? No, I don't. Okay, thank you, Judge. Thank you. The case just argued is submitted, and we appreciate everyone's accommodation to our special schedule, and we will stand adjourned.
judges: Friedman, Graber, Watford